RECEIVED
DEC 22 2016 TM
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Ricardo Lopez-Betancourt,

    Plaintiff,

v.

Loyola University of Chicago Stritch School of Medicine,

    Defendant(s),

16cv11565
Judge Joan H. Lefkow
Magistrate Judge Susan E. Cox

### Complaint

Complaint of Mr. Ricardo Lopez-Betancourt against the Loyola University of Chicago Stritch School of Medicine violations of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. Mr. Ricardo Lopez-Betancourt brings complains against Loyola University of Chicago Stritch School of Medicine as follows:

### Introduction

This case involves Mr. Ricardo Lopez-Betancourt ("Mr. Lopez-Betancourt"), an individual diagnosed with latent autoimmune adult diabetes, celiac disease, major depression, and anxiety while enrolled as a medical student at Loyola University of Chicago - Stritch School of Medicine ("Loyola" or "Respondent"). On multiple occasions, Loyola denied the requests made by Mr. Lopez-Betancourt, as well as by his psychologist and psychiatrist, for a leave of absence as an accommodation to receive necessary treatment for his diabetes and related mental health and conditions. After Mr. Lopez-Betancourt failed his fourth attempt at the Step 1 exam due to Loyola's failure to provide a reasonable accommodation, Loyola refused to reinstate him, despite his having only a few clinical rotations remaining to complete medical school, and despite his commitment to becoming a physician.

### Statement of the Case

1. This is an action which arises under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182 *et seq*. ("ADA") and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq*. ("Rehabilitation Act").
2. Mr. Lopez-Betancourt seeks a determination that Loyola failed to provide him with reasonable accommodations, discriminated against him by treating him differently from his non-disabled counterparts, and unlawfully expelled him from Loyola, thereby denying him the benefits of its services, programs, and activities because of his disabilities, in violation of Title III of the ADA and the Rehabilitation Act.
3. Loyola failed to comply with the ADA and the Rehabilitation Act by discriminating against Mr. Lopez-Betancourt in the following ways:

1

    a. Denying the requests made by Mr. Lopez-Betancourt, Mr. Lopez-Betancourt's psychologist, and Mr. Lopez-Betancourt's psychiatrist for a leave of absence as a reasonable accommodation;

    b. Failing to modify the policy allowing only three attempts for the USMLE Step 1 exam as a reasonable accommodation when the National Board of Medical Examiners allows students six attempts;

    c. Reinstating Mr. Lopez-Betancourt in 2013 under the condition that he waive his right to an individualized assessment under the ADA;

    d. Treating Mr. Lopez-Betancourt differently than students without disabilities: upon information and belief, students without disabilities were not denied access to Loyola services and facilities, while Mr. Lopez-Betancourt was denied access to student health insurance and student mental health services after being readmitted to the program in August 2013;

    e. Dismissing Mr. Lopez-Betancourt from Loyola; and

    f. Otherwise denying Mr. Lopez-Betancourt the benefits of its services, programs, and activities because of his disability, in violation of Title III of the ADA and the Rehabilitation Act.

4. Loyola engaged in intentional discrimination, as it acted with both discriminatory intent and discriminatory animus in its treatment towards Mr. Lopez-Betancourt.

## Jurisdiction

5. The United States District Court of the Northern District of Illinois has jurisdiction over these claims because the claims arise out of the protections afforded by Section 504 of the Rehabilitation Act and Title III of the ADA.

6. This complaint is filed within two (2) years from the letter sent by Loyola's General Counsel dated December 23, 2014, refusing to reinstate Mr. Lopez-Betancourt or assist in efforts to enable him to sit for the Step 1 or Step 2 exams.

## Parties

7. Mr. Lopez-Betancourt was enrolled as a medical student at Loyola from August 2008 until his dismissal on May 14, 2014, at which time he had only three or four clinical rotations remaining to complete.

8. Mr. Lopez-Betancourt is an individual with latent autoimmune diabetes of adulthood, an endocrine and autoimmune disorder; celiac disease, a digestive and autoimmune disorder; anxiety, a psychiatric disability; and major depression, a psychiatric disability.

9. Mr. Lopez-Betancourt is a qualified individual with a disability and meets the eligibility requirements under the ADA and Rehabilitation Act.

10. Loyola, a private secondary institution, is a public accommodation under Title III of the ADA as a "facility operated by a private entity whose operations affect commerce" and a recipient of federal funding under the Rehabilitation Act. 28 C.F.R. 36.104; 34 C.F.R. 35.104(2).

## Statement of Facts

11. Mr. Lopez-Betancourt enrolled as a first year medical student at Loyola in 2008 to become a surgeon. He had a particular desire to provide medical services to the Latino community.
12. Per Loyola policy, medical students are required to take the Step 1 of the United States Medical Licensing Examination ("Step 1 exam") prior to the start of their third year and achieve a passing score by June of their third year.
13. Per Loyola policy, students are allowed three attempts to pass the Step 1 exam.
14. Mr. Lopez-Betancourt began studying for the Step 1 exam in June 2011.
15. On August 13, 2011, Mr. Lopez-Betancourt took the Step 1 exam for the first time.
16. Despite his advance preparation for the Step 1 exam, Mr. Lopez-Betancourt found that he had a lot of trouble maintaining his focus and understanding the test questions.
17. Mr. Lopez-Betancourt was very disappointed to learn that he had failed his first attempt of the Step 1 exam with a score of 154.
18. Given Mr. Lopez-Betancourt's strong academic history, he was unable to explain the onset of his difficulties with concentration.
19. In October 2011 during his third year of medical school, Mr. Lopez-Betancourt experienced a sudden, frightening loss of vision.
20. Mr. Lopez-Betancourt was diagnosed with latent autoimmune diabetes of adulthood (LADA), a form of type I diabetes, on October 26, 2011, and was placed under the care of an endocrinologist.
21. Uncontrolled or unregulated diabetes can result in loss of focus and impaired concentration.
22. Despite Mr. Lopez-Betancourt's LADA diagnosis, he was able to complete his surgery clerkship and received high marks on his performance evaluation from the supervising residents and attending surgeons.
23. At the time of his diagnosis, Mr. Lopez-Betancourt was unaware of the impact of LADA on his concentration and ability to focus on his studies and Step 1 exam preparation.
24. In early November 2011, Associate Dean of Student Affairs James Mendez ("Dean Mendez") informed Mr. Lopez-Betancourt of a new rule which mandated that all third year students pass the Step 1 exam by January 2012 in order to remain eligible for participating in clinical clerkships.
25. As of January 2012, Mr. Lopez-Betancourt's diabetes was still not under control and he continued to experience partial vision loss.
26. Mr. Lopez-Betancourt spoke with then-Director of the Center for Academic Excellence, Beth Sonntag, who informed him that he should prepare for the Step 1 exam and continue to participate in his third-year clinical clerkships.
27. Though he was still having difficulty with focusing and recalling information, Mr. Lopez-Betancourt took the Step 1 exam for the second time in June 2012.
28. Mr. Lopez-Betancourt failed in his second attempt of the Step 1 exam with a score of 176.
29. As Mr. Lopez-Betancourt's endocrinologist made adjustments to his medications to get the LADA under control, Mr. Lopez-Betancourt noticed that he was losing a significant amount of weight.
30. In September 2012, Mr. Lopez-Betancourt was diagnosed with celiac disease, which explained the weight loss.

31. At the recommendation of Dean Mendez, in January 2013 Mr. Lopez-Betancourt enrolled in a semester-long intensive Step 1 review program at Rosalind Franklin University taught by Dr. Gordon Pullen.
32. Dean Mendez did not inform Mr. Lopez-Betancourt that he would be ineligible for student loans during the spring 2013 semester until after Mr. Lopez-Betancourt had enrolled in the review program.
33. Because he did not receive financial aid, the $6000 cost of the review program created a financial hardship for Mr. Lopez-Betancourt.
34. When Mr. Lopez-Betancourt took the Step 1 exam on May 4, 2013, he had to take several breaks due to his fluctuating glucose levels and fear of a hypoglycemic emergency.
35. Mr. Lopez-Betancourt received a score of 185 on the Step 1 Exam, just a few points shy of the 188 minimum passing score.
36. Mr. Lopez-Betancourt received a letter from Loyola dated June 21, 2013, informing him that he had been dismissed from Loyola since he failed to pass the Step 1 exam in the three attempts allowed per school policy.
37. Mr. Lopez-Betancourt appeared before the Student Appeal Board on July 15, 2013 to appeal his dismissal from the program.
38. During the Student Appeal Board meeting, Dr. Pullen from the Step 1 exam review program spoke on Mr. Lopez-Betancourt's behalf and explained that, although Mr. Lopez-Betancourt had demonstrated a strong understanding of the substantive material covered on the exam, he appeared to be suffering from depression.
39. As a result of both the physiological effects of the disease and the stress of managing the disease, depression is not uncommon in individuals with LADA.
40. On July 22, 2013 Mr. Lopez-Betancourt learned that Loyola had agreed to reinstate him subject to several conditions.
41. As a condition for readmission to Loyola, Mr. Lopez-Betancourt was granted one final attempt to pass the Step 1 exam by December 31, 2013, and was informed that a fourth failed attempt would result in an immediate dismissal with no right to file an appeal.
42. The National Board of Medical Examiners permits medical students to take the Step 1 exam up to six times.
43. As a direct and proximate cause of Loyola's conditions for Mr. Lopez-Betancourt's readmission, Loyola improperly conditioned Mr. Lopez-Betancourt's readmission on a waiver of his right to individualized assessment under the ADA.
44. During a meeting with Dean Mendez on August 23, 2013 to discuss the conditions of his reinstatement to Loyola, Mr. Lopez-Betancourt was informed that he would no longer have student health insurance or access to Loyola facilities, including free mental health services.
45. On information and belief, other Loyola students were not denied access to student health insurance, Loyola facilities, or on-campus mental health services.
46. Mr. Lopez-Betancourt spent almost two months looking for a mental health professional since he no longer had student health insurance and was unable to utilize the free mental health services provided to other Loyola students.
47. Mr. Lopez-Betancourt met with Dr. Flavio Arana, a psychiatrist, for the first time in October 2013.

4

48. When Mr. Lopez-Betancourt first came to see Dr. Arana, he was very depressed and had low-self esteem due to his inability to pass the Step 1 exam.
49. Dr. Arana diagnosed Mr. Lopez-Betancourt with Major Depressive Disorder and Anxiety Disorder.
50. Dr. Arana prescribed several different medications for Mr. Lopez-Betancourt and made adjustments to the dosages as he worked to come up with an effective treatment regimen.
51. Mr. Lopez-Betancourt also began seeing a psychologist, Dr. Carolyn Kanagy, in October 2013.
52. Drs. Kanagy and Arana worked with Mr. Lopez-Betancourt to resolve his depression and anxiety.
53. Mr. Lopez-Betancourt's depression was so severe during the period of October 2013 through February 2014 that he has relied upon notes from his psychologist and psychiatrist to reconstruct all of the details of events from this time period.
54. Dr. Kanagy wrote a letter to Dean Mendez on November 20, 2013, explaining Mr. Lopez-Betancourt's diagnosis of anxiety and the effects of LADA on Mr. Lopez-Betancourt's ability to focus while taking the Step 1 exam.
55. Upon witnessing Mr. Lopez-Betancourt's inability to open a book in preparation for the upcoming Step 1 exam or exercise effective judgment, Drs. Kanagy and Arana contacted Dean Mendez on several occasions to arrange a meeting, but did not receive a response.
56. Dean Mendez agreed to speak with Dr. Arana via telephone on January 16, 2014, during which time Dr. Arana expressed his professional opinion that Mr. Lopez-Betancourt needed to receive four to six months of treatment and counseling without interference from school.
57. Dean Mendez denied Dr. Arana's request for a leave of absence on Mr. Lopez-Betancourt's behalf, and instead agreed only to extend the deadline of the Step 1 exam until March 1, 2014.
58. Dr. Kanagy wrote a letter to Dean Mendez dated January 24, 2014, recommending that Mr. Lopez-Betancourt continue to participate in psychotherapy for a period of time prior to retaking the Step 1 exam.
59. In late January 2014, Mr. Lopez-Betancourt tried to register for a February Step 1 exam test site but was unable to locate any open testing seats.
60. Mr. Lopez-Betancourt continued to search for available February test seats up until February 28.
61. On February 28, 2014, Dean Mendez agreed to give Mr. Lopez-Betancourt an extension on the Step 1 exam until the end of March 2014.
62. Drs. Arana and Kanagy both advised Mr. Lopez-Betancourt that he should take four to six months off from school to concentrate solely on his treatment and adapt to his medications.
63. Although Mr. Lopez-Betancourt's anxiety and depression continued to worsen during this period, he registered to take the Step 1 exam in April in hopes that he would somehow be able to complete the necessary preparation.
64. Dean Mendez emailed Mr. Lopez-Betancourt on April 2, 2014 and threatened Mr. Lopez-Betancourt with administrative withdrawal from Loyola if he did not sit for the April 9 Step 1 exam.
65. On April 14, 2014, Dean Mendez emailed Mr. Lopez-Betancourt and asked him to write a letter agreeing to withdraw from Loyola if he failed to sit for the April 22, 2014 Step 1 exam.
66. Mr. Lopez-Betancourt spoke with Dean Mendez in April 2014, during which time he requested a leave of absence for mental health reasons upon the recommendation of his psychologist and psychiatrist and urged Dean Mendez to speak with Drs. Arana and Kanagy directly.

67. In response to his request for a leave of absence, Dean Mendez informed Mr. Lopez-Betancourt that he was "out of policy."
68. Mr. Lopez-Betancourt asked Dean Mendez whether he could speak with one of the higher deans and Dean Mendez threatened him with expulsion.
69. Mr. Lopez-Betancourt explained the effects of his depression to Dean Mendez, who simply urged Mr. Lopez-Betancourt to "get over it" and compared Mr. Lopez-Betancourt to other students with disabilities.
70. In late April 2014, Mr. Lopez-Betancourt contacted Dean Mendez to again request a leave of absence in order to continue his mental health treatment and gain further control over his celiac disease and diabetes.
71. Dean Mendez denied Mr. Lopez-Betancourt's request for a leave of absence.
72. Mr. Lopez-Betancourt took the Step 1 exam for the fourth time on April 24, 2014, believing it was his only chance to remain in medical school.
73. As a direct and proximate cause of Loyola's failure to provide the accommodations requested by Mr. Lopez-Betancourt and his treating mental health professionals, Mr. Lopez-Betancourt received a failing score of 180 on his fourth attempt of the Step 1 exam.
74. Mr. Lopez-Betancourt was dismissed from Loyola on May 14, 2014, due to his failure to meet the conditions of his reinstatement -- passing the Step 1 exam on his fourth attempt.
75. Dean Mendez contacted Mr. Lopez-Betancourt's former classmate via email on May 14, 2014, without Mr. Lopez-Betancourt's knowledge or consent, to inform him that Mr. Lopez-Betancourt had failed to pass the Step 1 exam in four attempts and had been dismissed from Loyola.
76. Mr. Lopez-Betancourt received a phone call from Dean Sonntag on May 15, 2014, but was never informed of his enrollment status at any point during the conversation.
77. Mr. Lopez-Betancourt contacted Dean Mendez on May 16, 2014 to ask permission to retake the Step 1 exam since his health had significantly improved.
78. Drs. Arana and Kanagy sent a letter to Dean Mendez dated August 11, 2014, describing the effects of Mr. Lopez-Betancourt's depression on his cognitive functioning and academic performance and discussing the progression of Mr. Lopez-Betancourt's treatment plan and medication regimen.
79. Mr. Lopez-Betancourt's endocrinologist Dr. Mazhari contacted Loyola on September 10, 2014 to express her concerns that Mr. Lopez-Betancourt's dismissal from Loyola was the result of his various health conditions.
80. By September 2014, according to Mr. Lopez-Betancourt's psychiatrist, his depression was in remission.
81. Mr. Lopez-Betancourt was not formally notified of his dismissal from Loyola effective May 14, 2014 until he requested a copy of his entire Loyola file in October 2014.
82. Attorney Deborah Pergament of Children's Law Group sent a demand letter on Mr. Lopez-Betancourt's behalf dated November 10, 2014 to Loyola University's General Counsel.
83. Loyola responded to Ms. Pergament's letter on December 23, 2014, by refusing to reinstate Mr. Lopez-Betancourt or take actions which would enable him to sit for the Step 1 and Step 2 exams.
84. Mr. Lopez-Betancourt has weekly appointments with Dr. Kanagy and sees Dr. Arana for issues with his medications, which have remained consistent over the past year.

85. Now that Mr. Lopez-Betancourt's LADA and mental illnesses are under control, Mr. Lopez-Betancourt is eager to accomplish his goal of graduating from medical school and is more than capable of retaking and passing the Step 1 exam.

## Legal Framework

### The Americans with Disabilities Act ("ADA")

86. Mr. Lopez-Betancourt brings this complaint under Title III of the ADA which prohibits public accommodations from discriminating against individuals on the basis of disability. Title III's provisions are found at 42 U.S.C. § 12181 *et seq.* and Title III's implementing regulations are found at 28 C.F.R. § 36.101 *et seq.* Title III provides that:
    [N]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. 42 U.S.C. § 12182.
87. Under the ADA, Loyola has an ongoing obligation to provide students with "reasonable modifications" and to engage in the interactive process with students to identify potential effective accommodations.
88. Title III of the ADA defines discrimination to include the following:

    (i) The imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered;
    (ii) A failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations; 42 U.S.C. §12182(b)(2)(A).
89. Under the ADA, an individual or entity shall not, directly or through contractual arrangements, utilize standard or criteria or methods of administration –
    (i) That have the effect of discriminating on the basis of disability; or
    (ii) That perpetuate the discrimination of others who are subject to common administrative control. 42 U.S.C. § 12182(b)(1)(D).
90. Any private entity that offers examination or courses related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals. 28 C.F.R. § 36.309(a).

(1) Any private entity that offers a course covered by this section must make such modifications to that course as are necessary to ensure that the place and manner in which the course is given are accessible to individuals with disabilities.

(2) Required modifications may include changes in the length of time permitted for the completion of the course, substitution of specific requirements, adaptation of the manner in which the course is conducted or course materials are distributed. 28 C.F.R. § 36.309I.

### The Rehabilitation Act

91. The Rehabilitation Act prohibits discrimination against individuals with disabilities in programs and activities which receive federal funding.
92. The definition of "program or activity" under Section 504 of the Rehabilitation Act includes a college, university, or other postsecondary institution, or a public system of higher education. 29 U.S.C. § 794(b)(2)(a).
93. Under Section 504 of the Rehabilitation Act, "no otherwise qualified individual with a disability...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..."Id. § 794(a); 34 C.F.R. §104.4(a).
94. A recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap:
    (i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service
    (ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others.
    (vii) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service.
    (3) A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration
        (i) That have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap,
        (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons. 34 C.F.R.§ 104.4(b)
95. Under the Rehabilitation Act, Loyola is required to make reasonable modifications of policies, practices, and procedures if necessary to avoid discrimination.
96. Department of Education regulations promulgated under Section 504 provide:
    A recipient to which this subpart applies shall make such modifications to its academic requirements as are necessary to ensure that such requirements do not discriminate or have the effect of discriminating, on the basis of handicap, against a qualified handicapped applicant or student...Modifications may include changes in the length of time permitted for the completion of degree requirements, substitution of specific courses required for the completion of degree

requirements, and adaptation of the manner in which specific courses are conducted." 34 C.F.R. § 104.44(a)

[S]hall take such steps as are necessary to ensure that no handicapped student is denied the benefits of, excluded from participation in, or otherwise subjected to discrimination because of the absence of educational auxiliary aids… Id. §104.44(a), (d).

### Violations of the ADA and the Rehabilitation Act

97. Mr. Lopez-Betancourt is a qualified student with a disability under the ADA and Rehabilitation Act.
98. Due to the actions and inactions of Loyola as alleged herein, Loyola has discriminated against Mr. Lopez-Betancourt and excluded him from participating in, or enjoying the benefits of, its services, programs, and activities, in violation of the ADA, 42 U.S.C. §12101 *et seq.* and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*
99. Loyola violated the ADA and Rehabilitation Act by failing to provide reasonable modifications and accommodations in the form of a leave of absence despite numerous requests from Mr. Lopez-Betancourt and his mental health professionals for a leave to allow Mr. Lopez-Betancourt to obtain the necessary medical and psychiatric treatment to allow him to effectively prepare for the Step 1 exam.
100. A request for a reasonable accommodation may originate directly from the individual with the disability or from the individual's representative.
101. A request for a reasonable accommodation under the ADA and Rehabilitation Act does not require any specific language, so long as it conveys that a person has a disability and needs a reasonable accommodation for disability-related reasons.
102. Once a reasonable accommodation is made by a qualified individual with a disability or an individual's representative, it triggers the interactive process to identify prospective accommodations.
103. Mr. Lopez-Betancourt spoke with Dean Mendez about his disabilities on numerous occasions, specifically the recommendation of his mental health professionals to take a leave of absence to focus on his treatment.
104. The written correspondence from Drs. Kanagy and Arana to Dean Mendez, along with Dr. Arana's phone conversation with Dean Mendez on January 16, 2014, qualifies as requests for reasonable accommodations made on Mr. Lopez-Betancourt's behalf, not mere suggestions.
105. Mr. Lopez-Betancourt requested a leave of absence as a reasonable accommodation from Dean Mendez and also repeatedly urged Dean Mendez to speak with Drs. Kanagy and Arana.
106. Loyola violated the ADA and Rehabilitation Act by denying Mr. Lopez-Betancourt's request for a leave of absence and failing to engage in the interactive process to identify other potential effective accommodations.
107. Loyola discriminated against Mr. Lopez-Betancourt in violation of the ADA and Rehabilitation Act by treating him differently from other students by restricting his access to Loyola facilities and health care services provided to all students
108. Loyola discriminated against Mr. Lopez-Betancourt in violation of the ADA and Rehabilitation Act by dismissing him in May 2014, thereby denying him the full and equal enjoyment, as well as

9

excluding him from participating in or benefiting from the "goods, services, facilities, privileges, advantages, or accommodations" of Loyola. 42 U.S.C. § 12182(a).

109. In the letter dated August 3, 2013, Loyola violated the ADA and Rehabilitation Act by preemptively denying Mr. Lopez-Betancourt's ability to request a future accommodation and reinstating Mr. Lopez-Betancourt as a medical student upon the condition of his waiving his right to an individualized assessment as a student with disabilities.

110. Loyola discriminated against Mr. Lopez-Betancourt in violation of the ADA and Rehabilitation Act by engaging in retaliatory conduct that consisted of failing to accommodate him and dismissing him from Loyola because he had previously asserted his rights under the ADA and Rehabilitation Act. 28 C.F.R. § 36.206

111. Loyola has discriminated against Mr. Lopez-Betancourt in the letter from the Office of the General Counsel dated December 23, 2014, by refusing to allow Mr. Lopez-Betancourt to be readmitted into the medical school and allowed to retake the Step 1 exam.

112. Loyola's past and ongoing failure to provide reasonable accommodations to Mr. Lopez-Betancourt, its disparate treatment of Mr. Lopez-Betancourt, its conditional readmission of Mr. Lopez-Betancourt in August 2013, its dismissal of Mr. Lopez-Betancourt, and its retaliatory conduct are in violation of Mr. Lopez-Betancourt's rights under the ADA and the Rehabilitation Act.

113. As a direct and proximate result of Loyola's actions and Loyola's repeated failures to comply with the ADA and the Rehabilitation Act, Mr. Lopez-Betancourt has suffered severe emotional pain, anguish, embarrassment, and humiliation.

## Relief Sought

114. Mr. Lopez-Betancourt respectfully requests a finding that Loyola has subjected and continues to subject Mr. Lopez-Betancourt to discrimination because of his disabilities, in violation of the ADA and the Rehabilitation Act.

115. Mr. Lopez-Betancourt respectfully requests the following relief:
    a. Injunctive relief ordering Loyola to reinstate Mr. Lopez-Betancourt and allow him to sit for the Step 1 exam following a 6-8 week period of preparation;
    b. Injunctive relief enjoining Loyola to excuse Mr. Lopez-Betancourt's fourth failure of the Step 1 exam due to failure to provide reasonable accommodations necessary to enjoy equal access to Loyola's services, programs and activities;
    c. Injunctive relief prohibiting Loyola from treating Mr. Lopez-Betancourt differently than his non-disabled counterparts;
    d. Injunctive relief ordering Loyola to undergo periodic training regarding the ADA and disability awareness;
    e. Compensatory damages;
    f. All costs incurred by this suit, including any attorney's fees;
    g. Any other and further relief deemed just by this court.

Respectfully submitted,

Ricardo Lopez-Betancourt

Ricardo Lopez-Betancourt
1 East Scott St. Apt 1712
Chicago, IL 60610
T: 787-671-3755