**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RICARDO LOPEZ-BETANCOURT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-11565 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| LOYOLA UNIVERSITY CHICAGO | ) | |
| STRITCH SCHOOL OF MEDICINE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

*Pro se* Plaintiff Ricardo Lopez-Betancourt ("Plaintiff") brings this action against Defendant Loyola University Chicago ("Defendant" or "Loyola") for violations of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. Currently before the Court are two motions: Plaintiff's motion to amend—[88] is the sealed version, and [91] is the unsealed version—and Defendant's Motion for Summary Judgment [59]. In the first motion, Plaintiff seeks to amend some of his own statements of undisputed material fact and three of his responses to Defendant's statements of undisputed material fact. Plaintiff's motion to amend [88] and [91] is granted. The Court reviewed and considered Plaintiff's amended statements of fact and responses to Defendant's statements of fact in [88] and [91], as well as Defendant's objections and rebuttals in [86] and [98], and the documents the parties cited. Ultimately, the Court concludes that none of the facts or responses at issue in the amendments are necessary or material to the disposition of resolving Defendant's motion for summary judgment [59], except those facts included in the Court's opinion below. In the second motion, Defendant seeks summary judgment on all of

Plaintiff's claims. That motion [59] is granted and judgment will be entered in favor of Defendant and against Plaintiff on all claims. Civil case terminated.

## I. Background

The Court takes the relevant facts primarily from the parties' Local Rule 56.1 statements, [61], [71], [73], [76], [77], and [85]. The following facts are undisputed except where a disagreement between the parties is noted.

Plaintiff was enrolled as a medical student at Loyola University Chicago Stritch School of Medicine ("Stritch") beginning in August 2008. He was dismissed for the final time on May 14, 2014.[1] Defendant Loyola is a non-profit, private secondary institution and a place of public accommodation under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 et seq. ("ADA"), as a "facility operated by a private entity whose operations affect commerce" and a recipient of federal funding under Section 504 of the Rehabilitation Act, 29 U.S.C § 794 et seq. Plaintiff brings this action pursuant to Title III of the ADA and Section 504 of the Rehabilitation Act. This Court has subject matter jurisdiction over the Plaintiff's claims pursuant to 28 U.S.C. §§1331 and 1343. Venue is proper in this judicial district under 28 U.S.C. § 1391 because the events alleged in Plaintiff's complaint occurred within the Northern District of Illinois.

In 2008, Plaintiff enrolled as a first-year medical student at Stritch. Stritch medical students are required to take the Step 1 examination ("Step 1 Exam") of the United States Medical Licensing Examination ("USMLE") prior to the start of their third year of medical school and to achieve a passing score by June of their third year. Stritch allows its medical students three opportunities to pass the Step 1 Exam. After three failures, students are dismissed from Stritch. Between August 2011 and May 2013, Plaintiff took the Step 1 Exam three times and failed each

---

[1] The date of Plaintiff's final dismissal from Loyola, May 14, 2014, is undisputed. The date by which Plaintiff knew or should have known that he had been dismissed is disputed, as discussed below.

time.  Consistent with its policy, Stritch dismissed Plaintiff.  In a letter dated June 21, 2013, Loyola notified Plaintiff of his dismissal, his right to appeal the dismissal, and the process and deadline for appealing.  On July 15, 2013, Plaintiff appeared before Stritch's Student Appeal Board to appeal his dismissal from Stritch.

As a result of the appeals process, Loyola offered Plaintiff conditional readmission.  The offer and terms were conveyed in a letter from James Mendez, Stritch's Associate Dean for Student Affairs, dated August 13, 2013.  In the letter, Stritch offered Plaintiff "the opportunity to be considered for re-admission if ... [he] agree[d] to certain conditions."  [61] at 143.  The letter listed eight conditions, the first of which was that Plaintiff was "required to sit for and pass the USMLE Step 1 exam no later than December 31, 2013."  [61] at 143.  The eighth condition was as follows: "If you do not pass your fourth attempt on USMLE Step 1, you will not be allowed any further attempt. You will be dismissed with no right of re-appeal."  [61] at 143.  The August 13 letter requested that Plaintiff confirm his acceptance of the terms by signing a copy of the letter and returning it to Stritch.  *Id.*  On August 23, 2013, Plaintiff signed the August 13 letter.  Plaintiff testified during his deposition that when he signed the August 13 letter, it was "probably [his] belief" that if he did not pass the Step 1 Exam on his fourth attempt, he would be dismissed from Stritch.  [61] at 129-130.  Defendant contends, and Plaintiff does not dispute, that the August 13 letter is a contract under Illinois law.

Plaintiff testified that he believed "the vast majority of the [August 13 letter] became worthless" after Stritch did not require Plaintiff to adhere to certain terms of the August 13 letter, such as the December 31, 2013 deadline for taking the Step 1 exam.[2]  [61] at 130.  However, the

---

[2] Plaintiff disputed this statement of fact, claiming it was an "incomplete summary" of his testimony.  The Court reviewed his testimony and determined that the cited portion of the record supports the quotation and statement of fact.

eighth condition in the August 13 letter was never changed. Plaintiff also testified that "nobody at Loyola ever mentioned this Point No. 8 on this document ever again," and that after he signed the August 13 letter, no one at Loyola communicated with him about a right to appeal a dismissal after his conditional readmission. [61] at 130.

In October 2013, Plaintiff first met with Dr. Flavio Arana, a psychiatrist. Around that same time, Plaintiff also began seeing a psychologist, Dr. Carolyn Kanagy.

Plaintiff repeatedly requested to extend the deadline in the August 13 letter to take the Step 1 Exam, and Stritch ultimately agreed to give Plaintiff until April 24, 2014 to take the exam. [61] at 183. Plaintiff took the Step 1 Exam for the fourth time on April 24, 2014. On May 14, 2014, the results for Plaintiff's fourth attempt at the Step 1 Exam were released. Plaintiff did not pass. As a result, on May 14, 2014, consistent with the August 13, 2013 letter, Plaintiff was dismissed from Stritch because he failed to pass the Step 1 Exam on his fourth attempt.

Also on May 14, 2014, Dean Mendez sent two emails regarding Plaintiff. The first email informed Dr. Arana that:

> [Plaintiff] finally sat for his final attempt at Step 1 last month. The results were released today and, unfortunately, [Plaintiff] did not pass. His score was 180 and passing is 188. This was his fourth attempt and I am forced to dismiss him again. This time he won't be able to appeal for readmission.

[61] at 23. The second email (the "May 2014 Email") was to Dr. George Plamoottil, Plaintiff's former classmate. Dean Mendez wrote:

> [Plaintiff] finally sat for his final attempt at Step 1 last month. The results were released today and, unfortunately, [Plaintiff] did not pass. His score was 180 and passing is 188. This was his fourth attempt and I am forced to dismiss him again. This time he won't be able to appeal for readmission.

[61] at 145. Dr. Plamoottil testified that, within two weeks of receiving that email, he either forwarded it or read it verbatim to Plaintiff. [61] at 176. Plaintiff denies that Dr. Plamoottil did either. [76] at 5; [77] at 21.

Plaintiff received an email from USMLE on May 14 stating that his score was available, but he did not check his score. [61] at 132. The next day, May 15, Plaintiff returned a voicemail from Beth Sontag, Assistant Dean of Student Affairs at Stritch, and during that phone call he learned that he had failed the Step 1 Exam and asked Sontag to look up his score. [61] at 132-33. Plaintiff learned from Sontag that he had failed the Step 1 Exam. When asked if, at that time, he was concerned that he had been dismissed from Loyola, Plaintiff testified, "I knew that that was a possibility…I definitely gave it a thought." [77] at 187.

On May 16, 2014, Plaintiff sent Dean Mendez an email asking "[i]s there even any remote change [sic] I could take [the Step 1 Exam] again this summer, now that I am feeling much better." [61] at 144. Additionally, although Plaintiff had completed his third year clerkships, he had not taken the OB/GYN exam, which was another requirement that students must meet to begin their fourth year at Stritch. After May 2014, Plaintiff did not contact Dean Mendez to set up his OB/GYN exam. [61] at 136. Plaintiff also testified that when the Step 1 Exam results came out and he learned that he had failed, he "knew [he] could not go and register for fourth-year clerkships," and confirmed that after May 14, he "did not attempt to register for any fourth-year clerkships." *Id.* at 131.

On August 26, 2014, Dean Mendez sent an email to several Loyola employees stating that Plaintiff had been dismissed from Loyola, effective May 14, 2014, and attaching a dismissal letter. [77] at 115. The dismissal letter, dated August 26, 2014, is addressed to Plaintiff and lists in the

cc field two email addresses for Plaintiff.  [77] at 114.  Plaintiff denies receiving the dismissal letter, either by email or by postal service.

In September or October of 2014, Plaintiff met with attorneys at the Children's Law Group. He retained as his attorney Deborah Pergament, who contacted Dr. Plamoottil.  On October 8, 2014, at Pergament's request, Dr. Plamoottil forwarded to Pergament the May 2014 email he received from Dean Mendez.  See [61] at 179-80.  Dr. Plamoottil also testified that in September or October of 2014, he told Plaintiff that he had received an email from Dean Mendez about Plaintiff in May 2014.  See [77] at 190.  Plaintiff testified that he did not ask Dr. Plamoottil if he could look at the email.  [77] at 190.  Plaintiff went on to testify, "I'm not sure if [Dr. Plamoottil] forwarded [the May 2014 email] to me, but even if he forwarded it to me, I did not open it * * *." [77] at 190.

On November 10, 2014, on Plaintiff's behalf, Pergament sent a letter to Loyola's General Counsel, demanding Plaintiff's reinstatement to Stritch.  [61] at 147-157.  The letter asks Loyola to "reinstate" Plaintiff three different times:

> "Children's Law Group represents Ricardo Lopez-Betancourt, a medical student with a disability who is seeking *reinstatement* at the Stritch School of Medicine and to participate as candidate for Step 1 and Step 2 of the United States Medical Licensing Examination * * *." [61] at 147 (emphasis added)

> "Please consider this letter as a formal demand that Loyola University of Chicago-Stritch School of Medicine *reinstate* Ricardo Lopez-Betancourt, effective immediately."  *Id*. (emphasis added)

> "We have consulted with distinguished members of medical school faculties of major universities, including physicians who have served as department chairs, section heads and members of committees selecting and evaluating residents. * * * They have encouraged Mr. Lopez-Betancourt to pursue *reinstatement* at Loyola University-Chicago Stritch School of Medicine, to complete his medical education and to obtain a resident physician position.  *Id.* at 156 (emphasis added).

The letter also refers to the May 2014 email that Dean Mendez sent to Dr. Plamoottil, noting that it "informed Dr. Plamoottil that Mr. Lopez-Betancourt had failed the Step 1 exam, the number of times he had failed, and that Dean Mendez was forced to dismiss him." *Id.* at 154. When asked if he had reviewed the November 10, 2014 letter before it was sent to Loyola, Plaintiff testified, "I'm sure at some point I read this letter but…I don't think I read the entire letter" [61] at 139, and "I'm sure [my attorneys] probably sent it to me. But did I pay close attention to this letter? No." [61] at 140.

Loyola replied to the November 10 letter with a letter to Plaintiff's attorney, Deborah Pergament, dated December 23, 2014. [77] at 23-32. Loyola's December 23 letter responded to the claims in the November 10 letter and denied that there was any basis for reinstating Plaintiff as a student at Stritch. *Id.*

In late October 2014, Plaintiff submitted a formal request to Loyola for his academic records. On December 24, 2014 Loyola sent a UPS package via UPS service, containing Plaintiff's records. The package contained the August 26, 2014 email from Dean Mendez and attached dismissal letter. See [77] at 114-15. Plaintiff asserts that he never saw that dismissal letter before receiving the package of records in December 2014.

Plaintiff filed this lawsuit on December 22, 2016. In his Complaint, Plaintiff alleges that Loyola failed to provide him with reasonable accommodations, discriminated against him, and unlawfully expelled him in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182(a), and the Rehabilitation Act, 29 U.S.C. § 794(a). [1] at 1-2.

## II.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)).  The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014) (quoting *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008)).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  See *Celotex Corp.*, 477 U.S. at 323.  "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing

that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)); see also *Anderson*, 477 U.S. at 250. In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

## III.    Analysis

The Complaint [1] alleges violations of the Rehabilitation Act and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Defendant moves for summary judgment on all claims [59].

A two-year statute of limitations applies to Plaintiff's ADA and Rehabilitation Act claims. *Rutledge v. Ill. Dep't of Human Servs.*, 785 F.3d 258, 260 (7th Cir. 2015) (applying a two year statute of limitations to Rehabilitation Act claim; *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1075 (7th Cir. 2013) (applying Illinois's two-year statute of limitations for personal injuries to claims brought under Title III of the ADA); *Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 551 (7th Cir. 1996) (applying a two year statute of limitations to a failure to accommodate claim under the ADA); *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 933 (7th Cir. 1993) (noting that Rehabilitation Act claims are "closely akin to laws, which indisputably are civil rights laws, forbidding employment discrimination on grounds of race, sex, and age," and therefore a two-year limitations period applies to Rehabilitation Act claims, because the "Supreme Court has held that in borrowing statutes of limitations for federal civil rights cases the court should look to state statutes governing personal injury suits"); *Aberman v. Bd. of Educ. of Chicago*, 2014 WL 4912139,

at *4 (N.D. Ill. Sept. 30, 2014) (applying a two year statute of limitations to a claim under the Rehabilitation Act alleging failure to accommodate plaintiff's disability); see also [36] at 6.

A statute of limitations begins to run when the plaintiff discovers, or by exercise of due diligence would have discovered, that he has been injured and who caused the injury. *United States v. Duke*, 229 F.3d 627, 630 (7th Cir. 2000) superseded by statute on other grounds; *Perkins-Alexander v. Sanchez*, 16 F. App'x 484, 486 (7th Cir. 2001); *Fries v. Chicago & Northwestern Transportation Co.*, 909 F.2d 1092, 1095 (7th Cir.1990); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1386 (3d Cir.1994). "A plaintiff who either knew that he was injured or should have known is deemed to have 'discovered' the injury for purposes of the statute of limitations." *Duke*, 229 F.3d at 630. "The discovery rule does not permit the victim of an alleged wrong to postpone the running of the statute of limitations by willfully closing his eyes, ostrich-like, to a known probability that he has been injured, even if he is not certain." *Id.* The question that Defendant's motion for summary presents is: did Plaintiff know (or should he have known), more than two years before he filed this suit, that he had been dismissed from Loyola University of Chicago Stritch School of Medicine?

### A. Plaintiff's Attorney's Knowledge of Dismissal

Plaintiff's attorney knew more than two years before the Complaint was filed that Plaintiff was dismissed from Stritch, and that knowledge is attributed to Plaintiff. "[L]awyers are agents. Their acts (good and bad alike) are attributed to the clients they represent." *Johnson v. McBride*, 381 F.3d 587, 589 (7th Cir. 2004). "[E]rrors by an attorney acting on a party's behalf do not constitute external obstacles beyond the party's control." *Lombardo v. United States*, 860 F.3d 547, 552 (7th Cir. 2017). As such, a lawyer's knowledge of facts binds his or her client for statute of limitations purposes. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380,

397 (1993) ("each party is deemed bound by the acts of his lawyer-agent *and is considered to have notice of all facts, notice of which can be charged upon the attorney*") (emphasis added); *Resendiz v. Dretke*, 452 F.3d 356, 362 (5th Cir. 2006) ("We hold that the district court correctly found that the notice received by counsel was imputed to Resendiz * * *. "); *Donado v. Hardy*, 2011 WL 4715190, *2 (N.D. Ill. Oct. 5, 2011) ("Because Petitioner's counsel concedes that she did, in fact, receive notice that Petitioner's habeas petition had been denied while she was still representing Petitioner, notice of the judgment is imputed to Petitioner * * *."); see also *Acosta v. DT & C Global Mgmt., LLC,* 874 F.3d 557, 560 (7th Cir. 2017) ("In most cases, a party is bound to the actions of its attorney even when those actions are errors or omissions.").

Attorney Deborah Pergament represented Plaintiff beginning in September or October of 2014. The record does not clearly state when the attorney-client relationship ended, but it lasted at least through November 17, 2014, when Pergament sent Loyola a revised version of the November 10 letter seeking to have Plaintiff reinstated. It is also clear that she represented Plaintiff on October 8, 2014, when Dr. Plamoottil forwarded Pergament the email he had received from Dean Mendez. That May 14, 2014 email stated "[Plaintiff] did not pass [the Step 1 exam]. * * * This was his fourth attempt and I am forced to dismiss him again. This time he won't be able to appeal for readmission." [61] at 145. At that point, Plaintiff's attorney knew Plaintiff had been dismissed from Loyola. As a result of the attorney-client relationship, that knowledge is attributed to Plaintiff. *Pioneer Inv. Servs. Co.*, 507 U.S. at 397; *Resendiz v. Dretke*, 452 F.3d at 362; *Donado v. Hardy*, 2011 WL 4715190, *2; see also *Acosta v. DT & C Global Mgmt., LLC,* 874 F.3d at 560. Thus, Plaintiff knew no later than October 8, 2014 that he had been dismissed from Loyola.

To forestall questions about whether Pergament in fact knew Plaintiff had been dismissed, the Court turns to the November 10, 2014 letter she sent Loyola. In that letter, Pergament quoted

the May 14, 2014 email from Dean Mendez that Dr. Plamoottil forwarded to her. She also requested, three separate times, that Plaintiff be "reinstated" as a medical student at Loyola. The only reason he would need to be reinstated is that he had been dismissed. Pergament's letter confirms that she knew Plaintiff had been dismissed from Loyola, and her knowledge is attributed to Plaintiff.[3]

Because Plaintiff knew no later than October 8, 2014, that he had been dismissed from Loyola, his claim accrued, and the statute of limitations began to run, on October 8, 2014. That is more than two years before the December 23, 2016 filing of the complaint in this case. For that reason, Plaintiff's claims are barred by the statute of limitations, and Defendant's motion for summary judgment is granted.

**B. Plaintiff Should Have Known that He Had Been Dismissed**

Even if Pergament had not learned of Plaintiff's dismissal from Dr. Plamoottil's October 8, 2014 email, Plaintiff should have known that he had been dismissed from Loyola. The statute of limitations begins to run when a plaintiff discovers, *or by due diligence should have discovered*, an injury and the party that caused it. *Duke*, 229 F.3d at 630. This principle is often called the "discovery rule." The discovery rule does not permit an alleged victim to willfully close his eyes to a known probability that he has been injured, even if he is not certain. *Id.* Here, Plaintiff denies that he knew for certain that he had been dismissed. But he knew that he probably had been

---

[3] Plaintiff also reviewed the letter before Pergament sent it to Loyola, so by November 10, 2014 he saw the request for "reinstatement" and the email from Dean Mendez to Dr. Plamoottil stating that Loyola had dismissed Plaintiff for failing his fourth attempt at the Step 1 Exam. [61] at 139. But using this date as an alternative to October 8, 2014 does not save Plaintiff's claims; it is still more than two years before the Complaint was filed. Furthermore, when asked if he had reviewed the November 10, 2014 letter before it was sent to Loyola, Plaintiff testified, "I'm sure at some point I read this letter but…I don't think I read the entire letter" [61] at 139, and "I'm sure [my attorneys] probably sent it to me. But did I pay close attention to this letter? No." [61] at 140. As discussed below, ignoring evidence of his dismissal does not allow Plaintiff to prevent the statute of limitations from beginning to run.

dismissed, and he ignored information about his status and opportunities to confirm that he had been dismissed, and for that reason the statute of limitations began to run more than two years before he filed the Complaint.

First, Plaintiff knew that a condition of his readmission to Loyola was that he pass the Step 1 Exam on his fourth try, and he knew the consequence for failing would be dismissal without the right to appeal. The August 23, 2013 offer of conditional readmission laid out those terms clearly, and Plaintiff signed the letter and accepted those terms. Plaintiff testified during his deposition that, in August 2013, when he signed the August 13 letter, it was "probably [his] belief" that if he did not pass the Step 1 Exam on his fourth attempt, he would be dismissed from Stritch. [61] at 129-130. Those terms—the requirement of passing the Step 1 Exam on the fourth try, and dismissal as the consequence of failure—never changed.

Plaintiff then failed his fourth attempt at the Step 1 Exam. Although he knew his score was available on May 14, 2014, he declined to look at it and learn whether he failed. [61] at 132. The next day, Dean Sontag informed him that he had failed. When asked if, at that time, he was concerned that he had been dismissed from Loyola, Plaintiff testified, "I knew that that was a possibility…I definitely gave it a thought." [77] at 187. But he did not ask for clarification from Sontag on that call, or from any Loyola personnel, except perhaps in his request for academic records five months later.

Plaintiff knew that dismissal without a right of appeal was the consequence of failing the Step 1 Exam a fourth time, and he admits that he thought about that when he failed the fourth time. But in his briefs, Plaintiff claims to have been uncertain about his status as a student. Yet the record shows that Plaintiff failed to conduct due diligence, because he did not act on obvious opportunities to clear up his confusion. In his May 15, 2014 call with Dean Sontag, he did not ask

if he had been dismissed.  In his May 16 email to Dean Mendez, he did not ask if he had been dismissed.  Nor does the record reflect any other attempts to ascertain whether he had been dismissed, except perhaps the records request five months later.  In September or October 2014, Dr. Plamoottil told Plaintiff about the May 14, 2015 email he received from Dean Mendez, but he did not ask Dr. Plamoottil if he could read it.  [77] at 190.  Plaintiff also said, "I'm not sure if [Dr. Plamoottil] forwarded [the May 2014 Email] to me, but even if he forwarded it to me, I did not open it * * *."  [77] at 190.

In sum, Plaintiff did not seek out information that would confirm his dismissal and failed to act on opportunities that Dean Sontag, Dr. Plamoottil, and his own attorney presented to him.  Instead, he "willfully clos[ed] his eyes" to his dismissal.  Whether or not Plaintiff learned of his dismissal through his attorney—or whether her knowledge of the dismissal is attributed to Plaintiff—Plaintiff should have known of his dismissal by, at the very latest, November 10, 2014.  Accordingly, he is deemed to have discovered the injury for purposes of the statute of limitations at that time.  *Duke*, 229 F.3d at 630.

## IV.    Conclusion

For the reasons explained above, Plaintiff's motion to amend, [88] and [91], is granted, and Defendant's motion for summary judgment [59] is granted.  A final judgment under Federal Rule of Civil Procedure 58 will be entered in favor of Defendant and against Plaintiff on all claims.  Civil case terminated.

Dated:  September 3, 2019

_____
Robert M. Dow, Jr.
United States District Judge